UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:  09-60494-CIV-MARTINEZ-BROWN**

DIANA BROWN,

      Plaintiff,

vs.

AL LAMBERTI, as Sheriff of Broward County,
in his official capacity, CHIEF GEORGE
JARBOE, individually, EXECUTIVE
LIEUTENANT LINDA CANADA-STUCK,
individually,

      Defendants.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon the Individual Defendants' Motion for

Summary Judgment in their Individual Capacities based on Qualified Immunity **(D.E. No. 79)**,

and Defendants' Motion for Summary Judgment **(D.E. No. 93)**.  In her corrected amended

complaint, Plaintiff asserts claims for race and gender discrimination (Count I) and retaliation

(Count II) in violation of Title VII of the Civil Rights Act of 1964 against Defendant Al Lamberti

in his official capacity as Sheriff of the Broward Country Sheriff's Department, and a claim for

race discrimination and retaliation in violation of 42 U.S.C. § 1981 (Count III[1]) against

---

[1] In Plaintiff's corrected amended complaint, she characterizes Count III as both a claim
pursuant to the equal protection clause of the Fourteenth Amendment and as a claim for race
discrimination and retaliation pursuant to 42 U.S.C. § 1981 and § 1983.  Based on the assertions
in Plaintiff's complaint and the arguments in her briefs regarding disparate treatment, the Court
construes Count III as a claim for race discrimination and retaliation in violation of 42 U.S.C. §
1981, brought against state actors pursuant to 42 U.S.C. § 1983.  *See Jett v. Dallas Indep. Sch.
Dist.*, 491 U.S. 701, 733 (1989) (holding that § 1983 is the exclusive remedy against state actors
for violations of rights conveyed by § 1981); *Butts v. County of Volusia*, 222 F.3d 891, 893 (11th

individual Defendants George Jarboe and Linda Canada-Stuck and Sheriff Lamberti in his

official capacity.  For the reasons listed below, the motions for summary judgment are granted.

## I.  Factual Background

Plaintiff Diana Brown joined the Broward Sheriff's Office ("BSO") in 1999 at the rank of

Sergeant.  Sometime in the beginning of 2002, she took a promotional exam and passed it,

becoming eligible for a promotion.  She was deployed to the military in November 2002.  In her

absence, she was promoted to the rank of lieutenant.  When Plaintiff returned from her military

service, she was on post-deployment military leave from June 2005 to August 2005.  Plaintiff

returned to work at the BSO in September 2005 for training.  On her return, she was assigned to

District 5, which is central Broward.  At that time, Chief George Jarboe was the district chief,

Lieutenant John Bukata was the executive officer, and John Fleming was a lieutenant like

Plaintiff.  (Pl. Dep. 13.)

## A.    Hurricane Wilma

Plaintiff's first day back at work after her training was the day Hurricane Wilma was

scheduled to hit, October 23, 2005.  She reported to work at 6:00 a.m. that day.  (Pl. Dep. 15, 18.)

The BSO was under emergency procedures that day in preparation for the hurricane.  (Pl. Dep.

18.)

On October 19, 2005, BSO issued a memo instructing personnel to prepare for the

hurricane and to have personal items, including bedding, toiletries, and changes of underwear for

at least four days available.  (Exh. 8, D.E. No. 80-1.)  The memo stated "Remember, personal

comfort depends upon how well each individual has prepared for the emergency." *Id*.  Plaintiff

Cir. 2000).

testified that she had not yet started work at the time this memo was issued and did not receive it. (Pl. Dep. 22.)

Plaintiff's time sheets reflect that she worked 18 hours on the night of the hurricane and into the second day, and 12 hours a day thereafter during the period of the hurricane. (Exh. 9, D.E. No. 80-1.) The time sheets show that most of the District 5 personnel worked from around midnight the night of October 23, 2005 through 6:00 a.m. on October 24, 2005. *Id.* At the end of the night of the hurricane, personnel who worked 12-hour night shifts following the hurricane, such as Lieutenant Fleming, were permitted to go home. *Id.* Personnel, such as Plaintiff, who were assigned 12-hour day shifts following the hurricane stayed on and worked their day shift. *Id.*

Plaintiff testified, however, that the time sheets were inaccurate for the first two days, October 23, 2005 and October 24, 2005. Her testimony varies regarding how much time she worked on those days. She testified in her deposition that she was not permitted to leave and go home[2] and that she worked either two 24-hour shifts or a 36-hour shift from 6:00 a.m. the first day until 6:00 p.m. a day later. (Pl. Dep. 25, 29, 34.) In an affidavit filed with her response to the motion for summary judgment, Plaintiff clarifies that she worked an 18-hour shift on October 23, 2005 but was not permitted to leave the district to go home to sleep.[3] (Pl. Aff. ¶ 6.) Plaintiff

---

[2] Elsewhere in her deposition, Plaintiff testified that she was permitted to leave during Hurricane Wilma to check on her mother, who lived in the area. (Pl. Dep. 24.)

[3] In her affidavit, Plaintiff states that the time sheets show she worked a continuous 36-hour shift and Lieutenants Bukata and Fleming did not. (Pl. Aff. ¶ 33.) This is a characterization of the evidence, rather than a claim Plaintiff has asserted personal knowledge regarding, and it is incorrect. The time sheets show that Plaintiff worked an 18-hour shift from midnight on October 23, 2005 to 6:00 p.m. on October 24, 2005. (Exh. 9 D.E. No. 80-1.) After that, she was off until 7:00 a.m. on October 25, 2005, and she worked a twelve-hour shift. *Id.* The time sheets do not

testified that Chief Jarboe stayed the entire time as well.  (Pl. Dep. 25-26.)  The time sheets reflect that Lieutenant Bukata, a white male, worked 22 hours on October 23, 2005, despite the fact that, like Lieutenant Fleming, he was assigned the night shift.  (Exh. 9, D.E. No. 80-1.)  The time sheets also show that Lieutenant Fleming, a white male, worked shifts no longer than twelve hours each night, including the night of the hurricane.  *Id*.

Plaintiff asserted in her affidavit that Lieutenants Bukata and Fleming were permitted to go home to sleep and change uniforms, but she was not.  (Pl. Aff. ¶6.)  She testified that, although she was allowed to go check on her mother for two hours, they were allowed to go home for "hours."  (Pl. Dep. 85.)  Plaintiff did not have an office in the BSO at that time, and Plaintiff asserts that Chief Jarboe told her she could sleep on the floor of the women's locker room.  *Id*.  In her deposition, Plaintiff testified that Chief Jarboe did not direct her regarding where to sleep, but he told her the female locker room was available.  (Pl. Dep. 33.)  There were no beds in the locker room.  *Id*.  Plaintiff testified that she did not know where in the building her male subordinates slept.  (Pl. Dep. 32.)

**B.      Hours and Vacation Time**

A Collective Bargaining Agreement applies to lieutenants such as Plaintiff and is binding on the BSO.  It requires that time off be allocated by seniority.  (Pl. Dep 26.)  Specifically, it provides that "[s]eniority will be one of the factors to be considered (along with other factors), in the sole discretion of the Sheriff, when bargaining unit member(s) request annual leave and holidays off, when conditions in a classification within the assigned work unit permit."  (D.E.

---

show that Plaintiff worked a continuous 36-hour shift.  Indeed, they show that her longest shift was four hours shorter than the 22-hour shift Lieutenant Bukata worked on October 23, 2005.

No. 80-1, Exh. 11).  The bargaining agreement goes on to explain that selection of annual leave and holidays will be held once a year in the beginning of February for the time frame through the following February.  Then, after the Sheriff determined the available vacation slots, "[t]he bargaining unit members will have a reasonable time to select his/her vacation slot (up to four . . . weeks) by seniority.  Each employee will be allowed to select his/her first pick and once all bargaining unit members have selected his/her [sic] first pick then a bargaining unit member will (by seniority) select their second pick."[4]  *Id*.  Plaintiff was the least senior lieutenant in the district.  (Pl. Dep. 44, 60.)  The bargaining agreement also provides, "[o]nce the request is approved BSO may not thereafter disapprove it unless an emergency or critical situation exists, as determined by the Sheriff or his designee."  *Id*.

In Plaintiff's affidavit, she asserted that "[o]nce members select their first pick, if their first pick is not obtained due to seniority the member picks a second pick which that member shall receive if their first pick is not honored."  Pl. Aff. ¶ 8.  Plaintiff further asserted, "[n]one of my picks were honored and they were denied by Jarboe and/or Canada-Stuck prior to the time I had even selected my first pick."  *Id*.  Plaintiff does not specify what picks she wanted, when they occurred, or who received the leave time that she wanted before she had a chance to submit her picks.[5]  However, in her deposition, she does give a few details regarding her leave.

---

[4] Deposition testimony cited by Plaintiff makes it clear that, even in the first round of vacation picks, if two lieutenants requested the same day, the senior of the two would get that day off.  (Vrchota Dep. 8-9.)  The determination as to who was senior and who received their first pick was not made until all the individuals within a bargaining unit, such as all the lieutenants, submitted their first pick.  *Id*. at 9.

[5] The Court notes that because Plaintiff was not working at BSO in February 2005, any leave she received between her October 2005 start date and February 2006 would have to be assigned after everyone else had made their first and second picks for that year.

Plaintiff testified that she worked on December 25, 2005 from 3:00 p.m. to 11:00 p.m. (Pl. Dep. 38.)  She testified that she was not originally scheduled to work Christmas 2005, but BSO was short of supervisors and Chief Jarboe scheduled her to work that day.  (Pl. Dep. 38-39.) She testified that no other lieutenants were there working and she was the shift commander.  (Pl. Dep. 39.)  She was, however, off that New Year's Eve, New Years Day, and January 2, which comports with the Collective Bargaining requirement that lieutenants be off on at least one holiday between Thanksgiving and New Years Day.  (Pl. Dep. 41-42.)  Plaintiff testified that she was not originally paid for working Christmas 2005, but she went to Chief Jarboe's secretary and received administrative time off, so the matter was resolved to her satisfaction.  (Pl. Dep. 62-63.)

Plaintiff did not have to work on Christmas Day in 2006, but she testified she was originally scheduled to work that Christmas and then got that day off when she filed a written complaint and requested a chance to speak with Major Rogers.  (Pl. Dep. 122, 123); (Pl. Aff. ¶ 9).  In total, during the fourteen months Plaintiff worked under Defendant Jarboe, she had more than fifty (50) vacation days.  (D.E. No. 80-1, Exh. 10.)

Plaintiff was originally on the day shift with weekends off.  (Pl. Dep. 60.)  Afterwards, she was assigned to the charlie shift, which was 2 p.m. to 10 p.m., which she was satisfied with, but she had Sundays and Mondays off, and she wanted weekends off.  (Pl. Dep. 65.)  From June 2006 to at least October 2006, Plaintiff had Friday and Saturday night off and had to report to work at 10:00 p.m. or midnight on Sunday night and work through Monday morning.  (Pl. Dep. 105-6.)  Plaintiff testified that she wanted Sunday night off in addition to Saturday night off and instead of Friday night off.  (Pl. Dep. 106.)  She testified that she was the only lieutenant working at midnight on Sunday nights.  (Pl. Dep. 106-7.)  She testified that all the other lieutenants had

weekends off.  (Pl. Dep. 66.)  She also asserted that when Lieutenant Fleming was the shift

commander of the charlie shift before and after her time as charlie shift commander, he had

weekends off.  (Pl. Dep. 10.)  On December 12, 2006, Plaintiff was transferred to North

Lauderdale to report to a new district chief, Louis Cavallo.  (Pl. Dep. 104.)  At that time, she had

weekends off.  (Pl. Dep. 104.)

**C.      Homeowner's Association Meetings**

District 5 had three homeowners associations.  (Pl. Aff. ¶ 11.)  Plaintiff testified that

sometimes when she came back to work to go to a homeowners association meeting in her

district, the central district, Chief Jarboe would tell her that she did not have to go and he was

going to go and attend the meeting.  (Pl. Dep. 55.)  Before Canada-Stuck arrived, Chief Jarboe or

Lieutenant Fleming attended the central district homeowners meetings.  (Pl. Dep. 58.)  Plaintiff

asserts that when Lieutenant Linda Canada-Stuck came to BSO,[6] Chief Jarboe took Lieutenant

Canada-Stuck to the central district's homeowners association meeting in Plaintiff's central

district and introduced Canada-Stuck as the new lieutenant in the district, even though he had

never taken Plaintiff and introduced her.  (Pl. Dep. 55.)  Plaintiff also testified that it was Chief

Jarboe's "general practice" to introduce new lieutenants to "members of the community and

associations they are assigned to protect."  (Pl. Aff. ¶ 11.)  She stated that he did so with the

unnamed white lieutenants other than Canada-Stuck as well.  (Pl. Aff. ¶ 11.)  Plaintiff also

alleges that he told a member of the community that Plaintiff did not wish to attend her

homeowners association meeting.  (Pl. Aff. ¶ 11.)  Plaintiff alleges that Jarboe also initially, until

_____

[6] Defendant Lieutenant Canada-Stuck did not come to BSO until April 2006.  Then, when
Canada-Stuck arrived, she was the executive lieutenant, who was directly below the chief in the
BSO hierarchy and above the other lieutenants.  (Pl. Dep. 59.)

overruled by Lieutenant Colonel Wright, refused to grant Plaintiff permission to attend one

homeowners association meeting whose president had specifically requested her presence.  (Pl.

Aff. ¶ 11.)  Plaintiff testified that she regularly attended homeowners association meetings

outside her district.  (Pl. Dep. 56.)  Plaintiff received a positive rating on her performance review

for her attendance at homeowners meetings.  (Pl. Dep. 57.)

**D.      Disciplinary Events Involving Plaintiff and Defendants Jarboe and Canada-Stuck**

Plaintiff testified that Sergeant Wishner came and told her that, following her flipping her

middle finger at her sergeants in jest during a meeting, Chief Jarboe asked Wishner if he wanted

to file a complaint against her for that.  (Pl. Dep. 108.)  Plaintiff testified that Wishner did not file

the complaint.  (Pl. Dep. 110.)

Someone filed an anonymous complaint in May 2006, stating that during a staff meeting

she told a sergeant "fuck you," and "shot her middle finger up when talking about crime stats."

(D.E. No. 80-1, Exh. 14.)  The complaint went on to state that Plaintiff "constantly behaves like

this . . . swears during roll call using disgusting profanity and the deputies are scared of her."  *Id*.

It also alleged that a deputy who was "going to file an EEOC complaint" was transferred off of

Plaintiff's shift "to prevent anyone from finding out about her behavior."  *Id*.  Plaintiff testified

that she did not know who filed the anonymous complaint.  (Pl. Dep. 111.)  She testified that

Jarboe told her that a deputy wrote it, but no deputies were present for the event.  (Pl. Dep. 113.)

Profanity itself is not forbidden in the BSO, but under certain circumstances its use will

be considered conduct unbecoming.  (Vrchota Dep. 27-28.)  There are no bright-line rules about

what kinds of profanity are acceptable and unacceptable, but BSO employees are discouraged

from cursing and are expected to treat others civilly and with respect.  (Vrchota Dep. 27-30.)

The Personnel Complaint Control Form on the anonymous complaint recorded that the charges were for conduct unbecoming an employee and official reports/truthfulness in BSO matters. (D.E. No. 80-1, Exh. 14.)  Plaintiff testified that she was suspended for a day for profanity on the recommendation of the Professional Standards Committee.[7]  (Pl. Dep. 110, 111.)

Plaintiff testified that she heard another BSO employee, Drew Cardelli, use profanity with Lieutenant Bukata and Chief Jarboe and not be disciplined for it.  (Pl. Dep. 96.)  Defendant Jarboe testified that other lieutenants and he himself use profanity.  (Jarboe Dep. 6.)  After Plaintiff was reported to internal affairs for her use of profanity, she reported orally to Chief Jarboe that an employee named Farrel said "fuck the sheriff" during roll call.  (Pl. Dep. 96.)  She testified that she did not file a complaint and that "I guess nothing happened."  (Pl. Dep. 96.)  Plaintiff also counseled Sergeant Lahiff for using profanity against one of her deputies and told him it would go to Internal Affairs, but Lieutenant Canada-Stuck issued a memorandum stating that the issue was closed because Plaintiff counseled the parties prior to it being sent to internal affairs.  (Pl. Dep. 95.)

Plaintiff testified that a BSO employee, Sergeant Jose Perez, came to Plaintiff and warned her that Canada-Stuck had asked him what time Plaintiff came to work, what time she went home, and whether she wore a uniform.  (Pl. Dep. 90-91.)  Plaintiff testified that lieutenants were required to wear uniforms and to be at work during their scheduled shifts.  (Pl. Dep. 91.)  Plaintiff later asserted, however, that Lieutenants Fleming and Bukata, who were white males, were permitted to wear civilian clothing while on duty and did so on numerous occasions.  (Pl.

---

[7] There is some confusion in the record regarding whether this one-day suspension was later rescinded.  *See* (Pl. Dep. 151.)  For the purposes of this motion, the Court will assume that it was not.

Dep. ¶ 15.)[8]

Plaintiff also testified that Deputy Roger Good told her that Canada-Stuck had asked him if Plaintiff gambled on duty and asked him if he wanted to file a complaint about it. (Pl. Dep. 93.) Plaintiff testified that Good denied that Plaintiff gambled on duty and declined to file a complaint. (Pl. Dep. 93.) Plaintiff asserted that "it was a well known fact" that a sergeant and a deputy who were both white males would make bets about who could lift the most weights and Canada-Stuck never sought to have them investigated. (Pl. Dep. ¶ 14.)

Plaintiff was never investigated or disciplined by internal affairs regarding her uniform, her work hours, or gambling on duty. (Pl. Dep. 109, 121.)

**E.    Events Surrounding Plaintiff's 2006 Performance Evaluation**

Plaintiff testified that Lieutenant Canada-Stuck, the executive lieutenant, was present in Chief Jarboe's office for one of Plaintiff's performance evaluations.[9] (Pl. Dep. 66.) Plaintiff testified that this was objectionable because it was unprecedented in her thirty years as a police officer. (Pl. Dep. 67.) Plaintiff acknowledged that she did not have personal knowledge regarding who was present for the evaluation of other BSO lieutenants. (Pl. Dep. 67.) Plaintiff asserted that Canada-Stuck was not originally Plaintiff's supervisor and had no supervisory authority over her.[10] (Pl. Dep. 69.) Plaintiff testified that at one point, her paperwork began

---

[8] Defendant Jarboe testified that he did not mandate that lieutenants wear uniforms provided that they dressed appropriately and professionally. (Jarboe Dep. 5.)

[9] In her deposition, Plaintiff did not identify the date of this evaluation, but exhibits before the Court indicate that it was in 2006 but covered a period of time from 2005 partway through 2006. (D.E. No. 80-1.)

[10] Plaintiff's testimony is ambiguous regarding whether Canada-Stuck was her supervisor at the time of the performance evaluation, because Plaintiff stated in her deposition that she was

going to Canada-Stuck instead of Chief Jarboe and Canada-Stuck then became her supervisor. (Pl. Dep. 69, 71.)

Plaintiff became upset and walked out of the performance evaluation.  ((Pl. Dep. 84.) Canada-Stuck followed Plaintiff and wanted to know why Plaintiff was upset.  (Pl. Dep. 87.) Plaintiff told Canada-Stuck, "You and Jarboe have a problem with blacks."  (Pl. Dep. 84.) Plaintiff testified that Canada-Stuck responded, "I don't have the problem.  Jarboe has the problem."  (Pl. Dep. 86.)  Plaintiff testified that Canada-Stuck asked Plaintiff why she did not request a transfer.  (Pl. Dep. 86.)

## F.   Plaintiff's Termination and Reinstatement

Plaintiff was terminated in June 2007, at a time when she was not under the supervision of Jarboe or Canada-Stuck.  (Pl. Dep. 125.)  She was terminated for four counts of insubordination.  (D.E. No. 80-1, Exh. 15.)  Although neither party has fully briefed the circumstances surrounding her termination, it appears to be connected to a confrontation she had with Defendant Jarboe in 2006 and Plaintiff's refusal to answer questions regarding the incident during a subsequent 2007 investigation.  *See* (D.E. No. 94-3, Exh. 16.)  Pursuant to the Collective Bargaining Agreement, Plaintiff filed for arbitration, and the arbitrator reinstated her less one week suspension without pay.  (Pl. Dep. 126-27.)  When she was returned, she was assigned to staff services.  (Pl. Dep. 128.)  She called to complain about being assigned to staff services, because she stated she did not have the background to do research or deal with statistical data, and they said they would send her to additional training.  (Pl. Dep. 129.)

Plaintiff has attached 68 pages of internal affairs records listing other employees who

---

not sure when the transition to Canada-Stuck being her supervisor occurred.

have had insubordination charges sustained against them, but Plaintiff has not discussed any of these alleged comparators individually in her briefs.  Only one of these alleged comparators is of the same rank as Plaintiff, Lieutenant Frank Ballante.  Ballante was working in Pompano Beach in 2007 when charges of insubordination were sustained against him.  He received ten days' suspension.  (D.E. No. 101.)  Plaintiff has not attached any description or details surrounding his insubordination or the insubordination of any other alleged comparators.

**G.    Plaintiff's EEO Complaints**

Plaintiff testified that she went to BSO's internal EEO office twice and orally complained that she was the victim of race and gender discrimination, but she never filed a written complaint of discrimination.  (Pl. Dep. 88-89); (Pl. Aff. ¶ 21).  After her termination, she filed a formal complaint with the EEOC.

**II.  Standard**

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  By its very terms, this standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Anderson*, 477 U.S. at 248;  *Matsushita Electric Indus. Co.,* 475 U.S.

at 586.  It is "material" if it might affect the outcome of the case under the governing law. *Anderson*, 477 U.S. at 248.  In addition, in considering a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party.  *Id*. at 255.

If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment.  *See United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 2d 1428, 1438 (11th Cir. 1991).  The moving party  "'must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).  "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 3d at 1438 (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.3d 1472, 1477 (11th Cir. 1991)).  *See also* Fed. R. Civ. P. 56(e).

In contrast, if the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim or affirmative defense. *Celotex*, 477 U.S. at 324. When the non-moving party bears the burden of proof, the moving party does not have to "support its motion with affidavits or other similar material *negating* the opponent's claim."  *Id*. at 323 (emphasis in original). The moving party may discharge its burden in this situation by showing the Court that "there is an absence of evidence to support the

nonmoving party's case." *Id*. at 324.  Once the moving party discharges its initial burden, a non-

moving party who bears the burden of proof must "go beyond the pleadings and by [its] own

affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate

'specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting Fed. R. Civ. P. 56(e)).

A non-moving party "may not rest upon the mere allegations or denials of the adverse party's

pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."

Fed. R. Civ. P. 56(e).

**III.  Analysis**

**A.     The Law Applicable to Plaintiff's Claims**

Title VII makes it unlawful for any employer "to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Section

1981 protects individuals from racial discrimination in the "making, performance, modification,

enforcement, and termination" of contracts, including contracts of employment.  42 U.S.C. §

1981.  Section 1983 is not itself a source of substantive federal rights; rather, it "merely provides

'a method for vindicating federal rights elsewhere conferred.'" *Baker v. McCollan*, 443 U.S. 137,

144 n. 3, 99 S.Ct. 2689, 2695 (1979).  Plaintiff's claims under § 1981 are merged into her § 1983

claim.  *See Jett*, 491 U.S. at 733.

The analysis or framework initially applied to determine whether Plaintiff has established

a claim under Title VII and § 1981/1983 is essentially the same.  *See, e.g., Alexander v. Fulton

County*, 207 F.3d 1303, 1314 n.6 (11th Cir. 2000) (noting that the substantive law and proof

requirements are the same for Title VII and § 1983 claims); *Rice-Lamar v. City of Ft.*

*Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000) (race and gender claims under Title VII and § 1981 use Title VII framework).  Therefore, the analysis regarding discrimination and retaliation will be equally applicable to Plaintiff's Title VII, § 1981, and § 1983 claims.

Plaintiff may establish a prima facie case of discrimination by presenting either direct or circumstantial evidence of discriminatory intent.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *accord Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).  The basic framework for establishing a prima facie case relying on circumstantial evidence is set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). The allocation of burdens are as follows:  (1) Plaintiff has the burden of establishing a prima facie case of discrimination or retaliation; (2) once Plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory, non-retaliatory reason for the action taken against the employee; and (3) the burden then shifts back to Plaintiff to raise a genuine factual question as to whether defendant's stated reason is mere pretext.  *See id*.; *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805-06 (11th Cir. 1995).

**B.**      **Direct Evidence**

Plaintiff asserts that this case includes direct evidence of racial discrimination, an assertion Defendants contest.  Specifically, Plaintiff asserts that Defendant Canada-Stuck's alleged statement that "Jarboe has a problem with blacks" is direct evidence of discrimination.

Direct evidence of discrimination is evidence that reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1086 (11th Cir. 2004);  *Damon v. Fleming Supermarkets of Florida*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter v. Three Springs Residential*

-15-

*Treatment*, 132 F.3d 635, 641 (11th Cir.1998)).  It is "evidence, that, if believed, proves the existence of a fact without inference or presumption." *Wilson*, 376 F.3d at 1086 (internal punctuation omitted) (citing *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)).  Evidence that "only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence."  *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (internal citations omitted).  "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate . . . will constitute direct evidence of discrimination." *Damon*, 196 F.3d at 1359 (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990)).  The most classic example of direct evidence is "a management memorandum saying, 'Fire Earley—he is too old.'" *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).  The Eleventh Circuit "has found direct evidence  where actions or statements of an employer reflect a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997)  (quotation marks and alteration omitted).  The Eleventh Circuit has also held that "a statement that members of a racial minority in general or women in general are simply not competent enough to do a particular job would seem to be a classic example of direct evidence." *Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 931 (11th Cir. 1995).

On the other hand, even racially charged comments, such as "Orientals do not look people in the eye when they talk to them," are not direct evidence of discrimination when they are not directly related to an employment decision.  *Johnson v. Nicholson*, No. 05-13259, 2005 WL 3199278, at *3 (11th Cir. Nov. 30, 2005); *see also Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227-28 (11th Cir. 2002) (holding that the statement "we'll burn his black ass" is not

direct evidence of discrimination when it was made two years before the challenged decision by an individual who was not, at the time the statement was made, Plaintiff's superior).

Accepting as true that Defendant Canada-Stuck voiced that opinion about Defendant Jarboe's racial attitudes, that statement is not sufficient to qualify as direct evidence of discrimination. Defendant Jarboe did not make the statement himself, and Defendant Canada-Stuck did not make any directly discriminatory comments herself. The statement is also not directly linked to any employment action about which Plaintiff complains. It also does not directly call into question the ability of African-Americans to work in law enforcement or as lieutenants. Therefore, the Court concludes that it does not qualify as direct evidence of discrimination. The Court will now consider circumstantial evidence under a burden-shifting analysis.

## C.     Disparate Treatment

Plaintiff may establish a prima facie case of gender or race discrimination based on disparate treatment by showing that: "(1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (applying this standard to a gender discrimination claim); *accord Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (applying this standard to a race discrimination claim). Defendants do not dispute the first prong of the prima facie case, but they do dispute the other three.

### 1.     Adverse Employment Action

Plaintiff's allegations regarding adverse employment actions are not clearly articulated in

her briefs, but it appears that she is alleging that her working conditions during Hurricane Wilma, the vacation and holiday hours she received, Defendant Jarboe's actions to discourage her from attending homeowner's association meetings, her one-day suspension for profanity, and her ten-day suspension for insubordination are all adverse employment actions.[11]

"In the public employment context § 1983, like Title VII, prohibits discrimination with respect to an employee's 'compensation, terms, conditions, or privileges of employment.'" *White v. Hall*, No. 09-15072, 2010 WL 2977443, at *2 (11th Cir. July 29, 2010) (citing *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir.2001)) (quoting 42 U.S.C. § 2000e-2(a)). "Courts have uniformly read this language to require a plaintiff to establish, as part of his prima facie case, that he suffered an 'adverse employment action,'" but "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Id.* Plaintiff must demonstrate that the alleged adverse action affected her job in "a real and demonstrable way" by pointing to evidence demonstrating a "*serious and material* change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239 (emphasis in original).

With respect to all Plaintiff's alleged adverse actions except the unpaid suspensions, "courts have been reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm" such as a reduction in salary. *Id.* at 1244. The long hours Plaintiff worked during Hurricane Wilma as an emergency responder fall

---

[11] Despite objecting to her 2006 performance evaluation in 2006, Plaintiff has not asserted that the performance evaluation amounted to an adverse employment action for the purposes of this litigation.

In opposing summary judgment, Plaintiff has also not argued that her termination, which her own employer rescinded, constituted an adverse employment action. Furthermore, Plaintiff has neither shown nor alleged that she was replaced by someone outside her protected class. *See Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004).

squarely into the category of "increased work loads" that "are not adverse employment actions but rather an ordinary tribulation of the workplace for which employees should expect to take responsibility." *Ausby v. Florida*, 624 F. Supp. 2d 1353, 1364 (M.D. Fla. 2008) (quoting *McGuire v. Miami-Dade County*, 418 F. Supp. 2d 1354, 1360 (S.D.Fla. 2006)).  Plaintiff has not shown that the failure of BSO to provide her with comfortable bedding during that one night of the hurricane, or to permit her to go home in the morning the way the night shift did, was a serious and material change to the terms of her employment.

Similarly, Plaintiff has not shown any serious and material change to the terms, conditions, or privileges of her employment relating to Jarboe's failure to introduce her to the homeowner's associations and his unsuccessful attempt to prevent her from going to their meetings.  With regard to her vacation time, Plaintiff has only pointed to one specific holiday[12] she worked that she did not want to work, Christmas 2005, and she was awarded admittedly satisfactory compensation leave for that.[13]  Nor does having Friday and Saturday nights off while working the night shift, rather than Saturday and Sunday nights off while working the night shift, constitute an adverse employment action.  *See O'Neal v. Chicago*, 392 F.3d 909, 913 (7th Cir. 2004)

(". . . losing a flexible work schedule and the ability to have weekends and holidays off also fall

---

[12] Although she did not mention it in her deposition, affidavit, or summary judgment briefs, Plaintiff has elsewhere asserted that she had to work on Thanksgiving 2005.  Plaintiff nevertheless received a major holiday off, in the form of New Year's Eve and New Year's Day, as required by her collective bargaining agreement.  She also received a total of more than fifty vacation days over fourteen months.

[13] The Court notes that an unsuccessful attempt to schedule Plaintiff to work over Christmas 2006 is not an adverse action.

short of an adverse employment action. These responsibilities are well within the reasonable scope of [the plaintiff's] duties as a sergeant in the Chicago Police Department, and requiring her to perform them does not constitute an adverse employment action for which federal law provides a remedy.")  Accordingly, the only clearly adverse actions Plaintiff has shown involve her two suspensions, which resulted in loss of pay.

       2.     <u>Similarly-Situated Comparators</u>

In order to establish disparate treatment, Plaintiff must point to a similarly situated comparator, and "the comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).  Furthermore, courts "require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from . . . confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999); *see also McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. May 9, 2008).  "[T]he most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Rioux v. Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008) (internal citations omitted).

With regard to the use of profanity, it is undisputed that all the lieutenants used profanity. Profanity itself is not against BSO rules, however; only profanity that amounts to conduct unbecoming an officer is forbidden.  Therefore, in order to evaluate whether Plaintiff's alleged comparators are similarly situated, the Court must know at a minimum the nature of the offenses they committed and the discipline they received.  With regard to "Farrel," apparently a male with an unidentified race who said "fuck the sheriff" during roll call, it appears that no formal

complaint was ever filed.  Plaintiff herself certainly did not file one.  It is also not clear whether he was disciplined or how.  Therefore, he is not a valid comparator.  The other alleged comparator, Segeant Lahiff, also a male of unspecified race, directed profanity at a deputy and Defendant Canada-Stuck intervened to see to it that he was only given counseling.  It is not clear whether a formal complaint was ever filed.  It is also unclear what profanity he used and what the circumstances were, such as whether the profanity was delivered publicly like Plaintiff's or privately.  It is clear that Sergeant Lahiff was not the same rank as Plaintiff when he used this unspecified profanity.  Accordingly, the Plaintiff has also failed to present evidence to create a dispute of material fact regarding whether Sergeant Lahiff is a valid comparator.

With respect to Plaintiff's ten-day suspension for insubordination, Plaintiff has also produced virtually no evidence regarding the circumstances and nature of the alleged comparators' insubordination.  Indeed, the Court has been provided very little evidence regarding Plaintiff's own insubordination.  Insubordination in particular seems to be the type of infraction that might vary wildly in severity depending on the circumstances and depending on the rank of the insubordinate person and of the person to whom the insubordination was directed.  The only alleged comparator of Plaintiff's rank received exactly the same discipline Plaintiff did—ten days' suspension.  Accordingly, Defendants should be granted summary judgment with respect to Plaintiff's disparate treatment claim because Plaintiff has not made out a prima facie case for race or gender discrimination.[14]

**D.    Hostile Work Environment**

---

[14] Although Defendants did not concede that Plaintiff was qualified for her job, they also did not dispute it.  The Court finds it unnecessary to address that factor.

Plaintiff also alleges that she was subject to race and sex discrimination through a hostile work environment.  To establish a claim for a hostile work environment, Plaintiff must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic such as race or sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  This type of claim requires Plaintiff to prove "that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Id*.

In determining whether harassment was sufficiently severe or pervasive, the Court considers the following: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating; and (4) whether the conduct unreasonably interfered with the employee's job performance.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998); *Mendoza v. Borden, Inc*., 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc).  The "severe and pervasive" standard has a subjective and an objective component, requiring Plaintiff to prove that she worked in an environment that she subjectively perceived to be abusive and that it was also an environment that a reasonable person would find hostile and abusive.  *Miller*, 277 F.3d at 1276.

In this case, Plaintiff has simply failed to come forward with evidence to show, first, that she was subjected to harassment due to her sex or race, and second, that the alleged harassment

was severe and pervasive.  The closest thing to harassment that she alleges is Canada-Stuck's

hunt to find infractions, Jarboe's snub with the homeowner's associations, and speculation about

whether Jarboe secretly filed the anonymous complaint regarding her use of profanity.  None of

these have any clear connection to her sex or race.  The only racial statement she alleges was ever

made to her was Canada-Stuck's one-time statement that Jarboe had a problem with black

people.  Even in combination, these things are not severe and pervasive.  Accordingly, summary

judgment is appropriate on Plaintiff's hostile work environment claim.

## E.   Retaliation

In order to establish a prima facie case for retaliation under Title VII or § 1981/1983, a

plaintiff must show that: (1) she engaged in statutorily protected activity; (2) an adverse action

occurred; and (3) the adverse action was causally related to the plaintiff's protected activity.

*Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004) (citing *Bass v. Bd. of County

Comm'rs*, 256 F.3d 1095, 1117 (11th Cir. 2001)).  In a retaliation claim, unlike a discrimination

claim, Plaintiff does not have to prove that the adverse action affected the terms and conditions

of her employment.  *See also Burlington Northern & Santa Fe Ry. v. White*, 126 S.Ct. 2405,

2408 (2006).

Even assuming Plaintiff has shown adverse actions under the standard set forth in

*Burlington*, Plaintiff has not presented any evidence of causation.  She alleges that she orally

complained about discrimination to Canada-Stuck and to the BSO's internal EEO office.  She did

not specify when she made the oral complaints to the internal EEO office.  She made the

complaint to Canada-Stuck after her 2006 evaluation, which was also after she had to work

holidays in 2005, after she had to work on Sunday nights, and after Chief Jarboe failed to

introduce her to the homeowner's associations.  Therefore, her complaint to Canada-Stuck

cannot have caused those events.  *See Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1284 (11th

Cir. 1999) ("At a minimum, Griffin must show that the adverse act followed the protected

conduct; this minimum proof stems from the important requirement that the employer was

actually aware of the protected expression at the time it took adverse employment action.")

(internal quotation omitted).  Plaintiff has also not shown that her complaints reached any

decisionmaker connected with her suspensions or her termination.  *See id*.  Accordingly,

summary judgment is warranted on Plaintiff's retaliation claims.

**F.    Qualified Immunity**

Government officials, such as Defendants Jarboe and Canada-Stuck, who are sued under

§ 1983 may seek dismissal of the claims against them on the grounds that they are entitled to

qualified immunity.  *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) (citing *Hope v.

Pelzer*, 536 U.S. 730, 739 (2002)).  "Qualified immunity protects government official performing

discretionary functions from civil trials (and from other burdens of litigation, including

discovery) and from liability if their conduct violates no clearly established statutory or

constitutional rights of which a reasonable person would have known." *Foy v. Holston*, 94 F.3d

1528, 1532 (11th Cir. 1996) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817-19 (1982)).

When confronted with an invocation of qualified immunity, the Court must first decide

the threshold issue of whether the defendant deprived the plaintiff of a constitutional right at all,

before addressing whether a particular right is "clearly established."  *Porter v. White*, 483 F.3d

1294, 1302 (11th Cir. 2007) (citing *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004); *Saucier v.

Katz*, 533 U.S. 194, 201 (2001)).  The Court proceeds to the "clearly established" prong of the

qualified-immunity inquiry only if a constitutional right would have been violated under the Plaintiff's version of the facts. *Porter*, 483 F.3d at 1303 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). In this case, having concluded that no constitutional rights have been violated, the Court need proceed no further with the qualified immunity analysis. Accordingly, after careful consideration, it is hereby:

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment in their Individual Capacities based on Qualified Immunity **(D.E. No. 79)**, and Defendants' Motion for Summary Judgment **(D.E. No. 93)** are **GRANTED**. This case is **CLOSED**, and all pending motions are **DENIED AS MOOT**. Final Judgment shall be entered by separate order.

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of October, 2010.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Brown
All Counsel of Record

-25-